# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ADAM BAKER, Personal**
**Representative to the Wrongful Death Estate of**
**VICENTE ANTONIO VILLELA, deceased, and**
**GUADALUPE MOTA, Individually.**

          **Plaintiff,**

**v.**                                              **No. CIV 19-00805 SCY/JHR**

**BOARD OF COUNTY COMMISSIONERS FOR**
**THE COUNTY OF BERNALILLO, KEITH BRANDON,**
**JOHNATHAN SANDOVAL, DAVID HUNTER,**
**SETH ROMERO, JESSE THOMPSON, LEVI CAIZZA,**
**SHAWN ADDY, CENTURION DETENTION HEALTH SERVICES, LLC,**
**MEDICAL JANE DOE 1, MENTAL HEALTH JOHN DOE 1.**

          **Defendants.**

## AMENDED COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS AND WRONGFUL DEATH

Plaintiff Adam S. Baker, by and through his counsel, Law Office of Matthew Vance, P.C. (Matthew Vance) and Coyte Law Firm, P.C. (Matthew Coyte), brings this complaint for damages caused by the violation of Vicente Antonio Villela's civil and constitutional rights.  Plaintiff Adam S. Baker files this complaint under the Federal Civil Rights Act, and the Constitution of the United States.  Plaintiff Adam S. Baker also brings claims under the New Mexico Tort Claims Act and Wrongful Death Act.  Plaintiff Guadalupe Mota, by and through her counsel, Lakins Law Firm, P.C., (Charles N. Lakins), joins in the bringing of this amended complaint for damages and asserts individual claims under New Mexico state law for her loss of consortium.

In support of this Complaint, Plaintiffs alleges the following:

## INTRODUCTION

Vicente Antonio Villela died while in the custody of the Bernalillo County Detention Center on or about February 2, 2019.  Vicente Antonio Villela suffocated to death while custody officers held him down in a prone position, with multiple physical restraints in place, and as officers knelt atop him and kneed him repeatedly in the back.  Vicente Antonio Villela died begging for air; repeatedly crying out, "I can't breathe; sir, I can't breathe," before he succumbed. Subsequent efforts to revive Vicente Antonio Villela were inadequate and failed because jail and medical staff ignored the readily apparent fact that Vicente Antonio Villela was asphyxiating and thereafter failed to provide appropriate lifesaving care.  The New Mexico Office of the Medical Investigator has determined that Vicente Antonio Villela's manner of death was homicide caused by mechanical asphyxia in the setting of physical restraints.  Vicente Antonio Villela died needlessly while in the care and custody of the Bernalillo County Detention Center and its staff.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action and the parties.

2. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. §§1331, 1343 and 42 U.S.C. §§1983 and 1988.

3. This Court also has supplemental jurisdiction over the State law claims alleged pursuant to 28 U.S.C. §1367.

4. Venue is proper pursuant to 28 U.S.C. §1391 and NMSA 1978 §38-3-1.

## PARTIES

5. Plaintiff Adam Baker, as Personal Representative to the Wrongful Death Estate of Vicente Antonio Villela, is an individual and resident of Santa Fe County, New Mexico.

6. Plaintiff Adam Baker was properly appointed as the Personal Representative to the Wrongful Death Estate of Vicente Antonio Villela in Cause No. D-202-CV-2019-02001 and in Cause No. D-202-PB-2019-0047.

7. Plaintiff Adam Baker, as Personal Representative of the Wrongful Death Estate of Vicente Antonio Villela appointed under Section 41-2-3 NMSA 1978 and by two orders of the Court in D-202-CV-2019-02001, is a proper party under Fed. Rule Civ. P. 17(b)(3) and Rule 1-017(B) NMRA to prosecute the claims hereunder.

8. At all times relevant to the subject matter of this litigation, the decedent, Vicente Antonio Villela, was a citizen of the United States of America and a resident of the State of New Mexico.

9. Vicente Antonio Villela was a pre-trial detainee in the custody and care of the Bernalillo County Metropolitan Detention Center (hereinafter "MDC") from February 2, 2019 to February 3, 2019.

10. While incarcerated, Vicente Antonio Villela was completely dependent upon MDC for his care and well-being.

11. Defendant Bernalillo County Board of County Commissioners (hereinafter "Defendant Board") is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. §1983.  At all times material to this Complaint, Defendant Board was the employer of Defendants Keith Brandon, Johnathan Sandoval, David Hunter, Seth Romero, Jesse Thompson, Levi Caizza, and Shawn Addy.

12. During all material times, Defendant Centurion Detention Health Service, LLC. (hereinafter "Defendant Centurion"), was responsible for providing medical and mental

health care to inmates at MDC pursuant to contract with an agency of the County of Bernalillo.

13. Defendant Centurion is a Delaware for-profit Corporation registered to do business in New Mexico.

14. At all material times, Defendant Board and Defendant Centurion acted through their owners, officers, directors, employees, agents, or apparent agents including, but not limited to, administrators, management, nurses, doctors, technicians and other staff, and are responsible for their acts or omissions pursuant to the doctrines of respondeat superior, agency or apparent agency.

15. At all material times, Defendant Keith Brandon (hereinafter "Brandon") was employed by MDC as a Lieutenant with supervisory duties.

16. At all material times, Defendant Brandon was acting under the color of state law and within the scope of his duties.

17. At all material times, Defendant Johnathan Sandoval (hereinafter "Sandoval") was employed by MDC as a correctional officer.

18. Defendant Sandoval was acting under the color of state law and within the scope of his duties at all material times.

19. At all material times, Defendant David Hunter (hereinafter "Hunter") was employed by MDC as a correctional officer.

20. Defendant Hunter was acting under the color of state law and within the scope of his duties at all material times.

21. At all material times, Defendant Seth Romero (hereinafter "Romero") was employed by MDC as a correctional officer.

22. Defendant Romero was acting under the color of state law and within the scope of his duties at all material times.

23. At all material times, Defendant Jesse Thompson (hereinafter "Thompson") was employed by MDC as a correctional officer.

24. Defendant Thompson was acting under the color of state law and within the scope of his duties at all material times.

25. At all material times, Defendant Levi Caizza (hereinafter "Caizza) was employed by MDC as a correctional officer.

26. Defendant Caizza was acting under the color of state law and within the scope of his duties at all material times.

27. At all material times, Defendant Shawn Addy (hereinafter "Addy") was employed by MDC as a correctional officer.

28. Defendant Addy was acting under the color of state law and within the scope of his duties at all material times.

29. At all material times, Defendant Medical Jane Doe 1 was employed by Defendant Centurion to provide medical care at MDC.

30. At all material times, Defendant Medical Jane Doe 1 was acting under color of state law and within the scope of her employment.

31. At all material times, Defendant Mental Health John Doe was employed by Defendant Centurion to provide mental health care at MDC.

32. At all material times, Defendant Mental Health John Doe was acting under color of state law and within the scope of his employment.

33. Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, Addy, Medical Jane Doe 1, and Mental Health John Doe 1 are being sued in their individual capacities only.

34. Plaintiff Guadalupe Mota is a resident of Bernalillo County; she was the domestic partner of Vicente Antonio Villela for more than seven years and is the mother of his two minor children Abril Sofia Villela and Julio Vicente Villela.

## **FACTUAL BACKGROUND**

 

35. Vicente Antonio Villela was born on July 9, 1981, in Denver, Colorado.

36. On February 2, 2019, Vicente Antonio Villela was a father with two children and a third on the way.

37. Vicente Antonio Villela was 37 years at the time of his death.

38. Vicente Antonio Villela weighed approximately 191 pounds.

39. Vicente Antonio Villela was 5'8'' in height.

40. On February 2, 2019 Vicente Antonio Villela was arrested by the Bernalillo County Sheriff's Department and taken to MDC for intake and booking.

41. A Bernalillo County Detention Center Offender Booking Sheet lists an "Admit Date" as 02/02/19 and an "Admit Time" of 19:19.

42. Video footage from MDC reflects that Vicente Antonio Villela first arrives in the MDC facility at approximately 16:12.

43. Vicente Antonio Villela was brought into the LEA/RDT sally port area of MDC.

44. Vicente Antonio Villela was pointed to a seating area and sat down.

45. At 16:13 a custody officer removed the handcuffs from Vicente Antonio Villela's wrists.

46. Vicente Antonio Villela thereafter sat on a bench and waited with three other detainees for processing.

47. Over approximately the next hour and fifteen minutes Vicente Antonio Villela was uncuffed, unrestrained, able to move about freely within the sally port area and was compliant with MDC officers and staff.

48. Vicente Antonio Villela sat for extended periods of time, talked with other detainees, interacted with MDC staff and complied with processing, including removing an outer layer of clothing and shoes, and submitting to an x-ray scan of his body.

49. Vicente Antonio Villela followed the directions of custody officers in the initial booking process and was compliant.

50. Vicente Antonio Villela admitted to MDC Officers and medical staff during the booking process that he was under the influence of methamphetamine; a drug that would place Vicente Antonio Villela in a medically vulnerable state for positional asphyxiation.

51. At the times material hereto, MDC had in place policies and procedures regarding the use of force in regard to persons in custody.

52. At the times material hereto, MDC had in place a policy in specific regard to prone position restraint and the dangers of such positional restraint, which read as follows:

E. Safety Considerations
1. Temporary Prone Control
    a.    Any person who is placed in restraints while in a prone position (face down with arms and legs out to the side) may be at risk for injury or medical issues including Positional Asphyxia. This is especially true for one who is obese, suffering from severe agitation, engaged in a prolonged struggle, or physical exertion.

    b.    While temporarily containing the inmate in a prone position, only the minimum number of security staff necessary to apply the desired restraint may put their weight on the inmate's back.

    c.    Immediately after the inmate has been adequately restrained from causing harm to himself/herself or others, or has stopped actively resisting, security staff will place the inmate on his or her side (left side is preferable), back, in a seated position or standing facing a wall.

    d.    Inmates will not be left in a prone position any longer than necessary to ensure staff member and inmate safety.

    e.    Security staff must carefully monitor an inmate's condition (respiration and level of consciousness) while he/she is temporarily in a prone position. The inmate's ability to speak without difficulty indicates that the airway is open and breathing and circulation is present. Also refer to paragraph 6 (below) which requires staff to continually monitor inmates for symptoms of medical distress and severe agitation.

    f.    If an inmate stops breathing or assumes a flaccid (limp, sagging or lifeless) posture, security staff shall remove any handcuffs and immediately begin appropriate first aid, cardiopulmonary resuscitation (CPR) and/or automatic external defibrillator (AED) procedures. Security staff will also immediately call for medical assistance. Security staff will continue to perform first aid, CPR and/or AED procedures until medical personnel take over. Sufficient security staff should be present in case the inmate regains consciousness and becomes violent.

53. MDC staff and officers were required to be aware of and be trained on these policies and procedures.

54. At about 17:38 Vicente Antonio Villela was placed into cell #5 in Receiving, Discharge, Transfer (RDT) to await his assignment to a general population pod.

55. Vicente Antonio Villela was alone in the cell and the cell door was closed and locked.

56. During the latter part of the intake process Vicente Antonio Villela became agitated and did not want to be moved to general population.

57. Vicente Antonio Villela voiced concerns to officers and told them he did not want to be moved.

58. While alone in cell #5, Vicente Antonio Villela posed no potential or actual threat to the safety of MDC officers or staff.

59. Defendant Brandon would later report that he had contact with Vicente Antonio Villela at about 16:20.

60. As a result of that contact, Defendant Brandon stated he concluded that Vicente Antonio Villela was either high on a substance or had a serious mental illness.

61. Defendant Brandon would later report that at approximately 19:15 Vicente Antonio Villela continued to display abnormal behavior; yelling, waiving his arms, and making random statements.

62. Despite that awareness, Lt. Brandon and the other Defendants started a course of conduct that would escalate to use of force and excessive force by himself and other officers.

63. Officers began to change their dialogue with Vicente Antonio Villela and refer to him as noncompliant and combative in anticipation of use of force against Vicente Antonio Villela.

64. Vicente Antonio Villela remained agitated about being moved from RDT to a general population pod.

65. At 21:18 Defendant Brandon began to video record contacts with Vicente Antonio Villela in anticipation of a use of force.

66. Defendant Brandon was aware that Vicente Antonio Villela was agitated and under stress and decided to call medical staff, John O'Neal, to talk with Vicente Antonio Villela.

67. While waiting for medical, Defendant Brandon started organizing an extraction team, or "Stack Team," to force Vicente Antonio Villela out of RDT cell #5.

68. Defendants Sandoval, Romero, Hunter, Thompson, Ciazza, and Addy were members of the "Stack Team."

69. To prepare for extraction, members of the "Stack Team" donned riot gear with face shields and vests.

70. Medical staff person John O'Neal arrived at Vicente Antonio Villela's cell to evaluate his mental state.

71. Medical staff person John O'Neal determined that Vicente Antonio Villela should be housed temporarily in a medical observation or isolation cell.

72. A hand-held video camera was obtained and the following events were recorded.

73. While Vicente Antonio Villela was speaking to Medical staff person John O'Neal, the extraction team lined up in front of Vicente Antonio Villela's cell. (See Image #1 Below).



Image #1

10

74. Defendant Brandon asked Vicente Antonio Villela to move cells one last time, and Vicente
Antonio Villela agreed to move.

75. Vicente Antonio Villela was asked to put his hands through the food port of his cell to "cuff
up," and Vicente Antonio Villela complied. (See Image #2 Below).



Image #2

76. Vicente Antonio Villela was escorted by the extraction team and Defendant Brandon to the
showers, where there is a dress out cage. (See Image #3 Below).



Image #3

77. Vicente Antonio Villela complied and entered the dress out cage.

78. His handcuffs were removed, and Vicente Antonio Villela complied with a strip search and dressed out in the MDC uniform.

79. During the dress out procedure, Vicente Antonio Villela stated, "I'm a little high, my bad."

80. Vicente Antonio Villela was again asked to "cuff up" and he again complied.

81. Vicente Antonio Villela was removed from the dress out cage.

82. As Defendant officers and Vicente Antonio Villela exited the shower room, Vicente Antonio Villela flinched and moved away from the door, appearing terrified.

83. Vicente Antonio Villela vocalized, "He's going to get me!"

84. Defendant Brandon ordered the extraction team to force Vicente Antonio Villela onto the ground.

85. Vicente Antonio Villela was tackled to the ground at approximately 21:55 on February 2, 2019, in the hallway outside of the shower cage. (See Image #4 Below).



Image #4

86. While on the ground Vicente Antonio Villela was placed in a four-point hold.

12

87. Vicente Antonio Villela was held in a prone position by the officers.

88. Defendant Sandoval positioned himself atop Vicente Antonio Villela.

89. Defendant Sandoval sat atop Vicente Antonio Villela.

90. While Vicente Antonio Villela was laying prone on the ground, Defendant Sandoval repositioned and put his knee into Vicente Antonio Villela's back and shifted all of his weight onto him. (See Image #5 Below).



Image #5

91. Vicente Antonio Villela was held on the ground, until four-point restraints could be obtained and placed on him.

92. Four-point restraints consist of handcuffs, leg shackles, and a belly chain; all connected with heavy chains.

93. The process of applying the four-point restraints took several minutes, during which time multiple officers continued to physically restrain Vicente Antonio Villela against the floor and wall.

94. In addition to the four-point restraints, Vicente Antonio Villela also had the first set of handcuffs from the shower cell still on his wrists.

95. Vicente Antonio Villela was eventually pulled to his feet by officers.

96. Vicente Antonio Villela was exhausted and sluggish.

97. Vicente Antonio Villela's breathing was accelerated from physical exertion.

98. Vicente Antonio Villela was faint. (See Image #6 Below).



Image #6

99. Vicente Antonio Villela requested water and was ignored.

100.     Vicente Antonio Villela assured officers restraining him that he wanted to comply with them.

101.     Vicente Antonio Villela assured officers he did not want to hurt them in any way.

102.     The extraction team continued to move Vicente Antonio Villela down the hallway at MDC towards the medical observation cell.



Image #7

103.    Vicente Antonio Villela complied but continued to be exhausted. (See Image #7

Above).

104.    Again, when they approached the entryway of the unit with the observation cell,

Vicente Antonio Villela was terrified and flinched.

105.    Vicente Antonio Villela shouted, "No, not with him. He's going to get me."

106.    After a member of the extraction team assured Vicente Antonio Villela he would

be in a cell by himself, Vicente Antonio Villela complied. Defendant officers continued

their use of force to forcefully push Vicente Antonio Villela into the isolation cell.

107.    Once they entered the isolation cell, Vicente Antonio Villela was ordered to lie face

down, in a prone position on the jail cell mattress.

108.    Vicente Antonio Villela complied.

109.    Vicente Antonio Villela was still handcuffed with handcuffs from the booking and

shower area and Vicente Antonio Villela was still restrained with a four-point cuff and

chain system.

110.    As Vicente Antonio Villela lied in a prone position on the mattress, the "Stack Team" was again ordered to place him in a four-point hold.

111.    Defendant members of the "Stack Team" were assigned to each of Vicente Antonio Villela's limbs to restrict his movement.

112.    Defendant members of the "Stack Team" began to work to remove the handcuffs and ankle cuffs retraining Vicente Antonio Villela.

113.    Defendant officers were focused on retrieving their four-point restraint system and handcuffs regardless of the harm they were inflicting.

114.    Vicente Antonio Villela was compliant.

115.    One officer placed his knee down and against Vicente Antonio Villela's head.

116.    Vicente Antonio Villela's head and face were forced downward, into the mattress and floor.

117.    This caused Vicente Antonio Villela to become stressed and agitated.

118.    Vicente Antonio Villela cried out, "He's gonna get me……he's gonna kill me."

119.    None of the officers relented; instead they began to press and restrain Vicente Antonio Villela with increasing force.

120.    Vicente Antonio Villela's face was pushed into the mattress and his voice became muffled.

121.    As officers shifted and repositioned, Vicente Antonio Villela assured officers he would let the officers remove his cuffs and asked them to "hold on," but as officers again pushed down on him, Vicente Antonio Villela struggled against the force applied to his head.

122.    Defendant Brandon began to tell Vicente Antonio Villela to stop resisting.

123.     Defendant Brandon then ordered, "Sandoval, get on top of him. Sit on him!"

124.     Defendant Sandoval complied with the order of Defendant Brandon.

125.     Defendant Sandoval physically moved to a position over Vicente Antonio Villela

and put his knee to Vicente Antonio Villela's back.

126.     Defendant Sandoval's body weight, over 200 pounds, was in excess of the total

body weight of Vicente Antonio Villela.

127.     Defendant Sandoval shifted all of his weight to Vicente Antonio Villela's back and

body, and compressed Vicente Antonio Villela against the mattress and floor. (See Image

#8 Below).



Image # 8

128.     Defendant Sandoval began kneeing Vicente Antonio Villela's in the back and ribs

with his right knee as Defendant Sandoval continued to press down with all, or the majority

of his weight, with his left knee in Vicente Antonio Villela's mid-back. (See Image #9

Below).



Image #9

129.     Defendant Romero attempted to remove Vicente Antonio Villela's handcuffs and restraints.

130.     Vicente Antonio Villela began to struggle for his life and told the extraction team that he couldn't breathe.

131.     In response, Vicente Antonio Villela was told to stop struggling.

132.     Defendant officers did not relent in their use of force; they ignored Vicente Antonio Villela's cries for help.

133.     Defendant officers did not move Vicente Antonio Villela onto his side.

134.     Defendant officers did not otherwise act to comply with MDC prone position policy or to restore Vicente Antonio Villela's ability to breathe.

135.     Officers deliberately ignored and violated their training.

136.     Despite the warning that Vicente Antonio Villela could not breathe, officers increased their use of force.

137.     Defendant Romero, rather than stop the use of force, continued to fight to remove the handcuffs from Vicente Antonio Villela.

138.     Vicente Antonio Villela could not breathe and began to panic as he tried to survive.

139.     Defendant Brandon told Vicente Antonio Villela, if he did not stop resisting, he [Defendant Brandon] was going to tase him.

140.     Vicente Antonio Villela continued to vocalize that he could not breathe.

141.     Defendant Brandon responded with indifference to Vicente Antonio Villela's pleas for breath; "[r]ight cuz they're having to hold you down."

142.     Vicente Antonio Villela repeated, "I can't breathe" at least 7 times before he eventually stopped struggling.  (See Image #10 Below).



Image #10

143.     Vicente Antonio Villela's breathing and cries for air became muffled.

144.     Vicente Antonio Villela's vocalizations became more like whimpers.

145.     Officers continued to restrain Vicente Antonio Villela in prone position and focus on removing the ankle and handcuffs.

146.     Defendant officers did not back off as Vicente Antonio Villela's movements subsided.

147.     Although Vicente Antonio Villela was already physically within an isolation cell and restrained by a four-point restraint system and a second pair of handcuffs, posing no threat to anyone, Defendant officers did not reduce the amount of force they were using, get off, or provide a "cooling off" opportunity.

148.     Defendant officers, at the direction of Defendant Brandon, remained focused on trying to remove the restraints from Vicente Antonio Villela, regardless of the amount of pain they were inflicting or the risk of death.

149.     The force used on Vicente Antonio Villela was not proportional to the need presented.

150.     Despite Vicente Villela's clear and repeated vocalizations that he could not breathe, none of the Defendant officers or others present took any action to remove Defendant Sandoval from on top of Vicente Antonio Villela, countermand Defendant Brandon's order, or otherwise acted to save Vicente Antonio Villela.

151.     Defendant officers did not reposition Vicente Antonio Villela onto his side.

152.     Defendant officers did not monitor Vicente Antonio Villela's condition.

153.     Defendant officers did not remove Vicente Antonio Villela from the prone position or place him in an unrestricted breathing position.

154.     Instead Defendant officers continued to restrain Vicente Antonio Villela in the prone position.

155.     Defendant officers were told to await "shots" from medical staff and were directed by Defendant Brandon to continue to hold Vicente Antonio Villela.

156.     The handheld video recording of the incident then cut out.

157.     Officers later stated that the memory card on the video recorder was full and a new camera had to be retrieved.

158.     After an unknown period of time, a subsequent video recording began with Vicente Antonio Villela still on the cell floor surrounded by officers.

159.     Officers were still working with the handcuffs and four-point restraints on Vicente Antonio Villela.

160.     A female voice asked from the doorway, "[i]s he breathing?"

161.     There was either no response or an inaudible response.

162.     As the handcuffs were finally removed, Defendant officers observed that Vicente Antonio Villela was not responding and appeared to have lost consciousness.

163.     Defendant Brandon narrated for the video recording that Vicente Antonio Villela had lost consciousness and Defendant Brandon stated, "I'm not sure what's going on, but we're going to try and get medical in here and assess from there."

164.     Vicente Antonio Villela was suffocated by MDC officers holding him face down on a mattress, and applying pressure to his chest, back, and head.

165.     Medical staff were present at the doorway of the cell.

166.     As medical staff Jane Doe 1 observed from the doorway, she was asked by Defendant Brandon if she wanted to examine Vicente Antonio Villela.

167.     Medical Jane Doe 1 declined to enter the cell and render medical assistance.

168.     After several minutes passed, a member of the extraction team finally checked Vicente Antonio Villela for a pulse.

169.     Defendant Brandon was advised that Vicente Antonio Villela did not have a pulse.

170.     Defendant Brandon then called a code blue medical emergency.

171.     Finally, Defendant Medical Jane Doe 1 entered the cell and began CPR.

172.     Medical Jane Doe 1 was unable to continue the physical demands of CPR for more than 30 seconds.

173.     MDC officers took over CPR for Vicente Antonio Villela almost immediately.

174.     Medical Jane Doe 1 called for an AED, indicating that Vicente Antonio Villela was, ". . . blue as can be."

175.     Given Vicente Antonio Villela's asphyxiation, the care sought to be provided by officers and medical staff, (i.e. CPR and AED), fell below the standard of care.

176.     Medical staff did not begin bagging Vicente Antonio Villela for several critical minutes; more than seven minutes into the video and for a total unknown period of time after Vicente Antonio Villela stopped breathing.

177.     Failure by medical staff and correctional staff to act immediately reduced the chances of saving Vicente Antonio Villela's life.

178.     During life-saving efforts, medical staff could not find the correct key to open the emergency crash-cart, depriving them of tools they could have used to save Vicente Antonio Villela's life.

179.     Medical staff brought an empty oxygen tank with them to the emergency medical situation, making it worthless.

180.     An MDC officer was forced to run to the medical department to search for an oxygen tank with oxygen in it.

181.     When the officer arrived in medical, he had to search through multiple oxygen tanks to find one that actually had oxygen in it.

182.     The delay in providing Vicente Antonio Villela oxygen also reduced the chances of saving Vicente Antonio Villela's life.

183.     Emergency medical technicians eventually arrived on scene and pronounced Vicente Antonio Villela dead.

184.     The New Mexico Office of the Medical Investigator determined that Vicente Antonio Villela's manner of death was homicide caused by mechanical asphyxia in the setting of physical restraints.

185.     Upon information and belief, the opinion of the New Mexico Office of the Medical Investigator regarding Vicente Antonio Villela's death, is that even if no drugs had been in Vicente Antonio Villela's system, the cause of death would still be mechanical asphyxiation caused by the Defendant officers.

186.     Vicente Antonio Villela endured pain and suffering as he slowly suffocated beneath the weight and restraint of Defendant officers.

187.     Vicente Antonio Villela died needlessly while in the care and custody of the Bernalillo County Detention Center and its staff, including Defendant officers and individuals.

### COUNT I: VIOLATION OF NEW MEXICO TORT CLAIMS ACT
### (Defendants Board, Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy)

188.     Plaintiffs restate each of the preceding allegations as if fully stated herein.

189.     Defendant Bernalillo County Board of County Commissioners was timely provided with Tort Claims Notice pursuant to NMSA 1978 §41-4-16.

190.     Under the New Mexico Tort Claims Act, (NMSA 1978 §§41-4-9 and 41-4-10), Defendant Bernalillo County Board of County Commissioners is not immune from suit under the facts of this case.

191.     The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death, or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties. NMSA 1978, 41-4-12.

192.     At all times material hereto, individual Defendant officers named herein were employees of Defendant Bernalillo County Board of County Commissioners, and were agents and employees of Defendant Bernalillo County Board of County Commissioners, and were authorized by Defendant Bernalillo County Board of County Commissioners to operate Bernalillo County Metropolitan Detention Center and at all times were acting in the scope of their duties and employment.

193.     The actions and inactions of Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy were done as agents and employees of Defendant Bernalillo County Board of County Commissioners and in the scope of their duties, and therefore Defendant Bernalillo County Board of County Commissioners is liable for the actions of Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy, as set forth herein.

194.    Defendant Bernalillo County Board of County Commissioners is responsible for the acts of the Bernalillo County Metropolitan Detention Center officers, staff, and medical personnel, as described herein, and is liable for their actions, including the named individual Defendants herein.

195.    The amount of force used by Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy against Vicente Antonio Villela was inappropriate and unjustified in the circumstances.

196.    In violation of the New Mexico Tort Claims Act, Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy did assault, batter, falsely imprison, and violate the rights, privileges, and immunities of Vicente Antonio Villela as secured by the laws of the United States and New Mexico, which resulted in bodily injury and wrongful death to him.

197.    The actions of Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy were done knowingly, intentionally, without justification, contrary to the policies of the Bernalillo County Metropolitan Detention Center, the training received by Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy and the U.S. Constitution, and were done for no legitimate penological purpose.

198.    The action of Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew or reasonably should have known that their conduct would lead to personal injury to Vicente Antonio Villela and to the deprivation of Vicente Antonio Villela's constitutional rights, not only by their individual action but also by the actions of the other individual Defendants herein.

199.     The actions of Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy resulted in personal and bodily injury to Vicente Antonio Villela and directly caused the wrongful death of Vicente Antonio Villela, and constitute violations of the New Mexico Tort Claims Act.

200.     Due to the actions of Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy, Vicente Antonio Villela was subjected to excessive and excruciating pain and received bodily injuries that directly caused his death.

201.     Vicente Antonio Villela begged for air and struggled for life as Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy acted to slowly kill him.

202.     The Wrongful Death Estate of Vicente Antonio Villela is entitled to an award of damages for Defendants' violation of the New Mexico Tort Claims Act.

**COUNT II: VIOLATIONS OF THE FOURTEENTH AMENDMENT
EXCESSIVE FORCE
(Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza and Addy)**

198.     Plaintiffs restate each of the preceding allegations as if fully stated herein.

199.     Vicente Antonio Villela, a pre-trial detainee, had a due process right under the Fourteenth Amendment to be free from physical abuse and excessive force, and to bodily integrity.

200.     Force used on a pretrial detainee is excessive if it is unreasonable.

201.     Force used on a pretrial detainee is excessive if it is used to punish.

202.     Force used on a pretrial detainee is excessive if there is no legitimate penological interest warranting its use.

203.     Force used on a pretrial detainee is excessive if it is not rationally related to a legitimate penological interest or is excessive in relation to the penological interest.

204.     Vicente Antonio Villela was under the influence of methamphetamine when he was booked into MDC.

205.     The methamphetamine placed Vicente Antonio Villela in a medically vulnerable state.

206.     Vicente Antonio Villela disclosed to MDC officers, including Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy, and staff that he was under the influence of methamphetamine during the booking process.

207.     Defendant Brandon, based on his contacts with Vicente Antonio Villela in the booking process, concluded that Vicente Antonio Villela was under the influence of drugs or had a serious mental illness.

208.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew or reasonably should have known that Vicente Antonio Villela was suffering from the effects of methamphetamines or a psychiatric condition.

209.     Vicente Antonio Villela let Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy know that he was afraid of being moved and placed in general population.

210.     It was readily apparent from Vicente Antonio Villela's conduct and statements that his paranoia of placement in general population arose from delusion or hallucinations, whether based in mental illness or methamphetamine use.

211.     Rather than leave Vicente Antonio Villela in RDT cell #5, where he was calm and alone in a locked cell, Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy elected to forcefully move him.

212.     Rather than provide psychiatric or medical care to Vicente Antonio Villela, Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy elected to forcefully move him.

213.     Vicente Antonio Villela did comply with Defendants' Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy request that he move from RDT cell #5.

214.     Vicente Antonio Villela complied in the placement of handcuff on him prior to exiting RDT cell #5.

215.     Vicente Antonio Villela complied in moving to the shower cage, stripping down, a search of his person, and a change out into an MDC jumpsuit.

216.     Vicente Antonio Villela complied again in placement of handcuffs before leaving the shower cage.

217.     Vicente Antonio Villela was compliant despite apparent delusions, paranoia, and a psychiatric crisis.

218.     When Vicente Antonio Villela, handcuffed and surrounded by MDC officers shrouded and protected in riot gear, again expressed fear for his safety in being moved, Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy responded with force.

219.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy forced Vicente Antonio Villela to the hallway floor to punish him for his behavior.

28

220.     Vicente Antonio Villela at no time threatened Defendants or showed any hostility toward them.

221.     Even after having been forced to the hallway floor, placed into a prone position, sat upon, kneed and knelt upon, placed in a four-point restraint system, and forcefully marched down the hallway, Vicente Antonio Villela assured Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy that he wanted to comply with their instructions and he did not want to hurt them in any way.

222.     As Vicente Antonio Villela approached the isolation cell area, he again reacted with fear for his safety.

223.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy again responded to Vicente Antonio Villela's apparent paranoia and medical condition by using force on him.

224.     Once Vicente Antonio Villela arrived in the isolation cell, Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy wanted to retrieve their handcuffs and four-point restraint cuff and chains.

225.     Rather than wait for Vicente Antonio Villela to gain his breath and calm down, Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy insisted on removing the handcuffs and four-point restraints immediately.

226.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy elected to use force.

227.     There was no legitimate penological interest in using force to remove the handcuff and four-point restraints.

228.     Vicente Antonio Villela was in the isolation cell.

229.     Vicente Antonio Villela was restrained.

230.     Vicente Antonio Villela did not pose a risk to Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy, or others.

231.     Vicente Antonio Villela still had not threatened or showed any hostility toward Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy.

232.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy used force despite Vicente Antonio Villela being in the isolation cell, despite the fact he was not threatening anyone, and despite the fact there was no reason to remove the cuffs or four-point restraints immediately.

233.     Even if there was a legitimate penological reason to remove the handcuffs and four-point restraints, the force Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy used to remove them was not rationally related to the need to remove them.

234.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy could have waited to remove the handcuffs and four-point restraints.

235.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy could have allowed Vicente Antonio Villela time to catch his breath and calm down.

236.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy had other reasonable and available options they elected not to pursue.

237.     The video tape demonstrates the use of force was to punish Vicente Antonio Villela for his unusual behavior.

238.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy did not really want to retrieve their handcuffs immediately.

239.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy wanted to punish Vicente Antonio Villela's behavior.

240.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy wanted to punish Vicente Antonio Villela because he was annoying them while under the influence of methamphetamines.

241.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy motive to punish is demonstrated further by their violation of MDC use of force policy and the prone restraint policy.

242.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy actions were unreasonable based on MDC's own use of force policy and the training provided to Defendants.

243.     At the time of the subject events, Bernalillo County Metropolitan Detention Center had in place a "Use of Force" Policy, which established guidelines for the appropriate use of force and restrains to be used in order to maintain and regain control of inmates.

244.     The MDC's "Use of Force" Policy requires that force is to be used only after attempts to gain an inmate's voluntary cooperation are unsuccessful.

245.     The MDC's "Use of Force" Policy expressly prohibits "excessive force" or "unnecessary force."

246.     The MDC's "Use of Force" Policy defines "excessive force or unnecessary force" as "force applied against an inmate that is greater than what is reasonable to control the inmate and gain compliance; continuing to apply force after the inmate complies; force that is applied after the inmate is retrained and complaint; force applied as a means of punishment or retaliation; force applied for the sole purpose of inflicting pain on an inmate;

or using force before using confrontation avoidance techniques and other alternatives to the use of force, which the circumstances permit the use of such techniques and alternatives."

247.     MDC's "Use of Force" Policy expressly prohibits "using force as the first response to an inmate's failure to follow instructions where there is no risk of harm to MDC staff or other inmates."

248.     The MDC "Use of Force" Policy expressly prohibits "using force on a restrained inmate unless such actions are reasonably necessary to prevent the inmate from harming any person or unlawfully damaging property."

249.     MDC's "Use of Force" Policy expressly prohibits "using force against an inmate after the inmate has ceased to offer resistance."

250.     MDC's "Use of Force" Policy expressly requires MDC officers to "first use alternatives to the use of force in an attempt to resolve the conflict if there is not immediate risk of harm to anybody, and there is not immediate risk of destruction of property."

251.     MDC's "Use of Force" Policy defines "severe agitation" as "a state of extreme mental and physiological excitement . . . characterized by any of the following symptoms: exceptional anxiety and hyperactivity, overheating, excessive tearing of the eyes, hostility, "superhuman" strength, aggression, acute paranoia and endurance without apparent fatigue."  MDC's Use of Force" Policy recognizes that, "[s]ubjects in a state of severe agitation are at an increased risk of sudden death."

252.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy were trained on the MDC "Use of Force" Policy.

253.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew that use of force against inmates is designed to be a last resort.

254.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew that de-escalation should be employed prior to any force being used against inmates.

255.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew that Vicente Antonio Villela was severely agitated and in a medically compromised condition prior to any use of force.

256.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew that a natural human response to being hurt or unable to breathe is to scream, yell out in pain, and struggle.

257.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew that Vicente Antonio Villela, being escorted by 6-7 correctional officers, while handcuffed in four-point restraints, posed no physical threat to themselves or others.

258.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy also knew that Vicente Antonio Villela was not intentionally resisting their orders.

259.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew that after consuming drugs, inmates often hallucinate, and see things that are not actually there.

260.     Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew that failure to comply with verbal commands does not immediately warrant any use of force.

261.    Despite their knowledge, Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy repeatedly used excessive force in response to Vicente Antonio Villela's apparent terror as he walking through the jail.

262.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knowingly violated the MDC "Use of Force" policy and "Prone Control" policy.

263.    At all times material hereto, Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy actively participated in a coordinated use of force on Vicente Antonio Villela.

264.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy knew that failure to comply with verbal orders does not authorize the use of knee strikes.

265.    Once Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy escalated to the use of force, at no further point did Defendants employ any de-escalation techniques

266.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy were aware that placing an inmate in the prone position, while consistently applying that kind of pressure, could result in death.

267.    MDC's own policy SEC 8.36-1 recognized the risk posed by having a person in restraints and in the prone position:

> "Any person who is placed in restraints while in a prone position (face down with arms and legs out to the side) may be at risk for injury or medical issues including Positional Asphyxia. This is especially true for one who is obese, suffering from severe agitation, engaged in a prolonged struggle or physical exertion."

268.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy did not seek to use the minimum number of custody staff necessary to mitigate the risk of death to Vicente Antonio Villela.

269.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy did not reposition Vicente Antonio Villela on his side, back, in a seated position, or in a standing position facing a wall, to mitigate the risk of death to Vicente Antonio Villela.

270.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy did not remove Vicente Antonio Villela from the prone position once it was no longer necessary, to mitigate the risk of death to Vicente Antonio Villela.

271.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy did not carefully monitor Vicente Antonio Villela's respiration and level of consciousness, to mitigate the risk of death to Vicente Antonio Villela.

272.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy did not monitor Vicente Antonio Villela's symptoms of medical distress or severe agitation, to mitigate the risk of death to Vicente Antonio Villela.

273.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy applied excessive force inspired by unwise, excessive zeal, and amounted to abuse of official power.

274.    As a result of Defendants' Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy actions, Vicente Antonio Villela began to and ultimately suffocate to death.

275.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy failed to timely begin lifesaving measures.

276.    Defendants' Brandon, Sandoval, Hunter, Romero, Ciazza, and Addy actions were objectively unreasonable under the standard set in *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015).

277.    The Tenth Circuit has held that putting substantial or significant pressure on an individual's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force. *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008).

278.    Defendants Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy did not take reasonable steps to protect Vicente Antonio Villela from the objectively unreasonable use of force of the other Defendants, despite being in a position to do so. Each is therefore liable for the damages resulting from the objectively unreasonable force used by the others. *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Circuit 2007).

279.    Defendants' Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy actions proximately caused Vicente Antonio Villela damages including extreme pain, mental anguish, emotional distress, pain and suffering, and death.

280.    Defendants' Brandon, Sandoval, Hunter, Romero, Thompson, Caizza, and Addy actions were intentional, malicious, sadistic, willful, wanton, obdurate and gross and reckless disregard of Vicente Antonio Villela's constitutional rights.

## COUNT III: VIOLATIONS OF THE FOURTEENTH AMENDMENT
## FAILURE TO PROVIDE MEDICAL ATTENTION AND CARE
### (All Defendants)

281.    Plaintiffs restate each of the preceding allegations as if fully stated herein.

282.    Defendants knew or should have known of Vicente Antonio Villela's life-threatening condition resulting from Defendants' use of multiple restraints, agitation, and physical exertion.

283.    Defendants knew Vicente Antonio Villela was in immediate need of medical care.

284.     After the first altercation in the hallway, Vicente Antonio Villela was faint and asked for water.

285.     Defendants ignored his request.

286.     After the first altercation, and as Defendants walked Vicente Antonio Villela down the hallway, it was obvious that Vicente Antonio Villela was in physical and mental distress; he was severely agitated.

287.     Despite the obvious signs of physical and mental distress, Defendants did not cease their use of force or provide medical care.

288.     During the second altercation, in the medical observation cell, Vicente Antonio Villela told Defendants at least seven times that he could not breathe.

289.     The medical need presented by Vicente Antonio Villela, through his repeated declarations that he could not breathe, his severely agitated presentation, the circumstances of the physical struggles, and the training of Defendants, demonstrated he was suffering from a serious and obvious medical need.

290.     With deliberate indifference to Vicente Antonio Villela's constitutional right not to be denied necessary medical care, Defendants failed to examine, assess, treat, and care for Vicente Antonio Villela.  They did so despite their knowledge of his obvious serious medical needs and their training in regard to use of force and prone position physical restraint, placing Vicente Antonio Villela at risk of substantial physical harm and death.

291.     Despite the life-threatening situation Defendants caused, they refused to release the pressure they were applying, and get Vicente Antonio Villela medical attention.

292.     Defendants were fixated on retrieving their cuffs and restraints from Vicente Antonio Villela, rather than attending to his health or safety.

293.　　　Vicente Antonio Villela was exhibiting obvious symptoms of suffocation.

294.　　　Vicente Antonio Villela lost consciousness.

295.　　　Despite his obvious need for medical care, Defendants did not immediately render aid or allow Vicente Antonio Villela to receive the treatment he needed.

296.　　　As a result of Defendants' actions, Vicente Antonio Villela suffocated and died.

297.　　　As a proximate and foreseeable result of Defendants' deliberate indifference to Vicente Antonio Villela's obvious medical condition, Vicente Antonio Villela suffered injuries including pain and suffering, emotional distress, and subsequent death.

298.　　　As a proximate and foreseeable result of Defendants' actions, Vicente Antonio Villela was subjected to inhumane conditions of confinement.　As a result of these inhumane conditions of confinement, Vicente Antonio Villela suffered injuries including pain and suffering, emotional distress, and subsequent death.

299.　　　Defendants' actions were intentional, malicious, sadistic, willful, wanton, obdurate and gross and reckless disregard of Vicente Antonio Villela's constitutional rights.

## COUNT IV: NEGLIGENT PROVISION OF MEDICAL CARE; LOST CHANCE OF SURVIVAL
### (Defendants Centurion Detention Health Services LLC, Medical Jane Doe No. 1, and Mental Health John Doe No. 1)

300.　　　Plaintiffs restate each of the preceding allegations as if fully stated herein.

301.　　　At all times material hereto, Defendant Centurion was responsible for medical staffing at MDC.

302.　　　At all times material hereto, Medical Jane Doe No. 1 and Mental Health John Doe No 1 were employees or agents of Defendant Centurion.

303.    With respect to their care and treatment of Vicente Antonio Villela, Defendant

Centurion and its employees owed Vicente Antonio Villela a duty to exercise that degree

of care, skill, caution, diligence, and foresight exercised by and expected for nurses and

mental health providers in similar situations.

304.    Medical staff had a duty to provide reasonable medical care to the inmates,

including Vicente Antonio Villela, housed at MDC.

305.    Medical staff had a duty to be properly equipped to handle emergency medical

situations.

306.    Defendant Centurion deviated from that standard of care and were negligent in

failing to properly assess, diagnose, and treat Vicente Antonio Villela.

307.    Medical staff breached their duty and failed to provide adequate medical care,

failing to have appropriate medical supplies, and failing to render care in a timely manner,

resulting in Vicente Antonio Villela's death.

308.    The breach in duty by medical staff at MDC caused or contributed to the death of

Vicente Antonio Villela.

309.    Medical staff at MDC, in breaching their duty to provide adequate medical care and

to reasonably handle emergency medical situations, deprived Vicente Antonio Villela of a

chance of survival.

310.    Defendant Centurion is vicariously liable for the acts and omissions of its

employees by respondeat superior.

311.    As a result of the negligent acts and omissions by medical staff, Vicente Antonio

Villela suffered significant physical and mental pain, other damages in the final minutes of

his life, and ultimately his death.

### COUNT V: NEGLIGENT TRAINING AND SUPERVISION
### (Defendant Centurion Detention Health Services LLC)

312.     Plaintiffs restate each of the preceding allegations as if fully stated herein.

313.     Defendant Centurion had a duty to exercise reasonable care in the training and supervision of its employees in a manner that provided the detainees under their care with reasonable medical care and treatment.

314.     Defendant Centurion  breached its duty to exercise reasonable care in the training and supervision of its subordinate employees.

315.     Defendant Centurion, because it knew or should have known of the lack of supervision, experience, and training among its employees, also had reason to know that its employees were likely to harm MDC detainees in need of medical care, including Vicente Antonio Villela.

316.     In failing to exercise reasonable care in the training and supervision of its employees relative to their providing reasonable medical care and treatment, Defendant Centurion was negligent.

317.     The negligence of Defendant Centurion proximately caused Vicente Antonio Villela significant physical and mental pain and suffering, loss at a chance of life, other damages in the final moments of his life, and ultimately death.

### COUNT VI:  LOSS OF CONSORTIUM
### (All Defendants)

318.     Plaintiff Guadalupe Mota incorporates the proceeding paragraphs as if set forth herein in full.

319.    "Los of consortium is a type of person injury damage because damages for consortium are damages for the plaintiff's emotional distress due to the harm to a sufficiently close relationship . . . Loss of consortium can be asserted against New Mexico government actors, despite that it is not specifically mentioned in the [TCA], provided that the underlying tort – the one that caused direct physical injury – itself triggers an immunity waiver. . . . Loss of consortium damages are derivative in nature because they arise from a physical injury upon another person.  Therefore, both the injury and the tort from which the children's claim for loss of consortium damages derive are specifically enumerated under Section 41-4-12." *Thompson v. City of Albuquerque*, 2017-NMSC-021, ¶¶8 & 9, 397 P.3d 1279.

320.    Unmarried persons are not precluded from recovering for loss of consortium, when the relevant factors indicate the two persons had an intimate familial relationship giving rise to a loss of consortium claim. *Wachocki v. Bernalillo County Sheriff's Dept.*, 2010-NMCA-021, 147 N.M. 720.

321.    Guadalupe Mota has been in a domestic partnership relationship with Vicente Antonio Villela for more than seven years and the relevant factors indicate she and Vicente Antonio Villela had an intimate familial relationship that gives rise to a loss of consortium claim on her behalf.

322.    Guadalupe Mota and Vicente Antonio Villela lived in the same household; she gave birth to his two minor children; the two of them made common contributions to a life together; the two of them relied upon each other for financial support and dependence; they had a strong emotional reliance with each other, and in all manners for all practical purposes Guadalupe Mota has been the wife of Vicente Antonio Villela.

323.    Due directly to the actions of Defendants that resulted in the death of Vicente Antonio Villela, Guadalupe Mota has been deprived of the familial relationship interest with Vicente Antonio Villela for the remainder of her natural life.

324.    Guadalupe Mota is entitled to an award of loss of consortium damages, due directly to the actions of all Defendants.

## **JURY DEMAND**

325.    Plaintiffs hereby demand a trial by jury on all counts.

WHEREFORE, Plaintiff requests judgment as follows:

1.    Compensatory damages in an undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2.    Punitive damages in an undetermined amount severally against the individually named Defendants.

3.    Reasonable costs and attorney's fees incurred in bringing this action.

4.    Pre and Post-judgment interest to the maximum extent allowed by law.

5.    Such other and further relief as the Court deems just and proper.


Respectfully submitted,

***Attorneys for Plaintiff Adam S. Baker
(all allegations and counts, excluding Count VI)***


   /s/ Matthew Vance
Matthew Vance
Law Office of Matthew Vance, P.C.
3800 Osuna Road NE, Ste. 2
Albuquerque, NM 87109
Phone: (505) 242-6267
Facsimile: (505) 242-4339
mattvance@mattvancelaw.com

-and-

Coyte Law, P.C.


 /s/ Matthew E. Coyte
Matthew E. Coyte
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030
mcoyte@me.com


-and-


***Attorney for Plaintiff Guadalupe Mota
(Count VI)***

Lakins Law Firm, P.C.


Approved 4/13/20
Charles N. Lakins, Esq.
P.O. Box 91357
Albuquerque, NM 87199
(505) 404-9377
Charles@lakinslawfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of April, 2020, I filed the foregoing electronically through the CM/ECF system, which caused Counsel of Record to be served by electronic means.


 /s/Matthew Vance
Matthew Vance